ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 2 8 2010

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HEATHER MATHIS,                           §
       PLAINTIFF,                         §
                                      §
                                      §
VS.                                       §   CIVIL ACTION NO. 4:08-CV-691-Y
                                      §
MICHAEL J. ASTRUE,                        §
COMMISSIONER OF SOCIAL SECURITY,          §
       DEFENDANT.                         §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

The plaintiff, Heather Mathis ("Mathis") filed her initial application for supplemental security income ("SSI") in June 2002, and that application was denied on August 30, 2002. (Transcript ("Tr.") 14.) Mathis filed a second application for SSI on April 12, 2004. (*Id.*) That request was denied initially on July 23, 2004 and again on reconsideration. (*Id.*) Mathis timely requested a hearing before an administrative law judge ("ALJ"), and a hearing was held in Fort Worth, Texas before ALJ Ward D. King on September 20, 2006. (Tr. 14, 795-815.) Mathis alleged that she was unable to engage in substantial gainful activity from May 5, 2002 through the date of the hearing.

(Tr. 14.) But the ALJ found no good cause to reopen Mathis' prior application, and he instead considered whether she was under a disability as of or after April 12, 2004, the date of her most recent application.[1] (Tr. 14-15, citing 20 C.F.R. § 416.1488(b).)

In her April 2004 application, Mathis claimed disability due to a number of physical impairments including lupus, rheumatoid arthritis, migraine headaches, vomiting, back pain, pain in her hands and feet, swelling, and fatigue. (Tr. 72, 115.) On February 21, 2007, the ALJ issued a decision finding that she was not disabled. (Tr. 11-26.) On July 25, 2008, the Appeals Council denied Mathis' request for review. (Tr. 5-10.) Mathis subsequently filed the instant action in federal court on November 20, 2008. (doc. #1.)

## II. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the

---

[1] The first month for which Mathis can claim SSI benefits is the month following the month in which her application was filed, regardless of how far back in time disability may extend. *See* 20 C.F.R. § 416.335.

individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R.

§§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198; *see also Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere

scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). The Court must, however, carefully scrutinize the record to determine if the evidence is present.

### III. ISSUES

1.  Whether the ALJ's determination that Mathis can perform her previous work is supported by substantial evidence;

2.  Whether the ALJ's evaluation of Mathis' fibromyalgia is supported by substantial evidence; and

3.  Whether the ALJ's residual functional capacity ("RFC") assessment is supported by substantial evidence.

### IV. ADMINISTRATIVE RECORD

A.    Background and Vocational History

Mathis was born on July 28, 1974. (Tr. 799.) She has a high school education and an associate's degree in business management. (Tr. 799-800.) Her past relevant work was as an assistant manager at a retail establishment, Eckerd Drug Store. (Tr. 805-06.) Mathis has not engaged in substantial gainful activity at any relevant time through the date of the ALJ's decision. (Tr. 15, citing 20 C.F.R. § 416.920(b).)

B.    Relevant Treatment History

A large, cumulative body of medical evidence spanning the years from 2001 to 2006 is in the record from Mathis' previously filed disability claim. A significant portion of the record documents an extraordinary amount of visits Mathis made to hospital emergency rooms seeking treatment, most

often for migraine headache pain. (Tr. 20, 141-378, 445-544, 573-680, 692-757; Pl. Br. 4.) Dr.

Clarence Brooks ("Brooks") was Mathis' primary care physician from 2002 to 2004. (Tr. 812.)

Mathis was also referred to two specialists for evaluation in 2002. The first, Dr. William E.

McIntosh ("McIntosh"), Chief of Neurology at the University of North Texas Health Science Center,

examined Mathis in February 2002. (Tr. 137-138.) After examining Mathis, McIntosh made the

following assessment on February 27, 2002:

> Chronic daily headaches, probably transformed migraines. She probably has a degree
> of drug-rebound with the amount of vicoprofen she admits to taking daily and has
> been taking some kind of medication many of which are associated with drug-
> rebound on a daily basis for a long time.

(Tr. 138.) McIntosh recommended that Mathis' physician stop prescribing her any medications

associated with drug-rebound, including narcotics, Midrin and ergotamines. (*Id.*) Instead, he

recommended other medications, including Amitriptyline, naproxen and Axert 12.5 mg. (*Id.*) The

records reflect, however, that Mathis went to the Harris Methodist Fort Worth ("HMFW")

emergency room at least a dozen times in the next three months alone, and that she was often

prescribed Vicoprofin, Vicodin or Stadol, all narcotic medications. (Tr. 238-304.) On May 5, 2002,

the emergency room physician noted that Mathis exhibited "possible drug seeking behavior." On

May 31, 2002, she went to the emergency room, requested narcotic medication, was told that it

would not be prescribed, refused to take anything else, and left against medical advice. (Tr. 239.)

Mathis was also referred to Dr. Gary Gottfried ("Gottfried"), a specialist in physical medicine

and rehabilitation and clinical electromyography. (Tr. 20, 137-140). He examined Mathis on August

7, 2002. (Tr. 139.) Gottfried conducted electrodiagnostic studies on her lower extremities, and he

communicated his findings in a letter to Brooks, Mathis' primary care physician. (*Id.*) In his letter

to Brooks, Gottfried noted that Mathis was "somewhat distressed regarding her pain but otherwise cooperative and in no acute distress." (*Id.*) He commented that she ambulated with a limp, that she complained of pain, and that her responses were "somewhat inconsistent." (*Id.*) Gottfried found that she had "mild edema" in her left ankle and knee as well as tenderness and "spotty areas of blunting between her knee and ankle" on physical examination. (*Id.*) But the nerve conduction velocity studies he conducted on Mathis revealed normal results. (Tr. 139-40.)

Brooks' medical records indicate that he saw Mathis at least 14 times between June 2002 and June 2003. (Tr. 410-17.) The records show that, during those visits, Brooks diagnosed Mathis with a number of conditions, including lupus, skeletal and joint pain, knee pain and swelling, hemoturia and pneumonia. (Tr. 401-17.) On June 4, 2003, Brooks completed a Medical Release/Physician's Statement form. In the form he indicated that Mathis was unable to work, or to participate in activities to prepare for work at all because she was permanently disabled. (Tr. 409.) He listed "Lupus" in the section labeled "Primary disabling diagnosis," and left blank the section labeled "Secondary disabling diagnosis." (*Id.*)

In 2003, Mathis visited the HMFW emergency room 10 times, complaining of migraines, back pain, blood in her urine, tooth and jaw pain and muscle and joint pain attributed to a lupus flare up. (Tr. 156-201.) She also visited the emergency department at Medical Center of Arlington that year complaining of a lupus flare up and possible seizure which had been witnessed by her roommate. (Tr. 528-42.) She was diagnosed with an exacerbation of lupus and she was given pain medication as well as Benadryl for itching. (Tr. 534.) Her physical examination revealed no tenderness of her neck or back and no sensory or motor deficits, and results of a head CT were

normal. (Tr. 539-542.) She was discharged with a prescription for Lortab, a pain medication, and instructions to read various publications by the Texas Health Care Association on the topics of rheumatoid arthritis, narcotic medication and seizures. (Tr. 540.)

In 2004, Mathis returned to the emergency department at the Medical Center of Arlington numerous times, complaining of migraines, vomiting, edema, tachycardia, pelvic pain, pain from lupus, fibromyalgia, shortness of breath, and knee pain. (Tr. 446-506, 590-674.)

Dr. Sudhakar Rumalla ("Rumalla") of the Texas Rehabilitation Commision ("TRC") examined her for purposes of disability evaluation on July 7, 2004. (Tr. 428-32.) The record reveals that Mathis failed to attend two prior scheduled appointments for evaluation. (Tr. 426-27.) After examining Mathis, Rumalla noted that Mathis' primary claims were "generalized arthralgias with predominant involvement of knee joints and elbow joints." (Tr. 431.) He noted that Mathis was "apprehensive," "somewhat agitated," and "tearful with moderate-to-severe pain." (*Id.*) His impressions were that Mathis had "generalized arthralgias," "lupus and rheumatoid arthritis, by history," "[c]hronic low back syndrome, probable secondary to rheumatoid arthritis," and "refractory error." (Tr. 432.) Ultimately, however, Rumalla wrote that he was "not sure whether [Mathis] would be able to perform any substantial work activities for gainful employment." (Tr. 432.)

Brooks continued to treat Mathis throughout 2004. (Tr. 379-425.) On various occasions her diagnoses were listed as arthritis, lupus, and migraines. (*Id.*) Once, on March 3, 2004, about a month before Mathis filed the instant disability application, Brooks' notes indicate that he treated Mathis for anxiety and depression. (Tr. 388-90.) Brooks drafted a letter on January 30, 2004 stating

that he was treating Mathis for lupus and rheumatoid arthritis and that she was totally disabled. (Tr. 396.)

Dr. Raymond Pertusi ("Pertusi"), a rheumatologist at the University of North Texas Health Science Center, evaluated Mathis in July 2004. (Tr. 435-44.) He determined that Mathis had a musculoskeletal pain syndrome resembling fibromyalgia, which "appear[ed] to be the main cause of her pain." (Tr. 443.) Pertusi found "no clinical evidence of disease activity" for either lupus or rheumatoid arthritis, but he noted that she was on "high dose steroids and hydroxychloroquine." (*Id.*) He also found that Mathis had "crepitation of the knee consistent with osteoarthritis," and that she had asthma. (*Id.*) Pertusi advised her to quit smoking. (Tr. 444.) In the comments following his diagnoses, he stated that he had given Mathis literature on fibromyalgia. (*Id.*) He also noted that, in the future, he might give her literature on osteoporosis, rheumatoid arthritis or lupus if he could confirm those diagnoses. (*Id.*) On follow-up, medical personnel noted that Mathis appeared to be in good health and that, other than tenderness in her knee, her examination for signs of pain revealed normal results. (Tr. 441.) Tests revealed that Mathis' rheumatoid factor and C-reactive protein tests were in the normal reference range, and no lupus anticoagulant was detected in her blood. (Tr. 438-40.)

On August 4, 2004, Mathis went to the Medical Center of Arlington emergency room complaining of back pain and reported a history of fibromyalgia. (Tr. 459-63.) Her back showed tenderness and decreased range of motion because of pain, but the examining physician noted that she did not have edema, that she had no limitations on range of motion in her extremities, no sensory deficits, and no respiratory problems. (Tr. 465). Mathis' chart from that day indicates that the

-8-

hospital had received notice from the state regulatory board regarding concern of narcotic abuse by Mathis because of number of Lortab prescriptions she had filled in a short amount of time. (Tr. 465.) Mathis returned to the emergency room at the Medical Center of Arlington numerous times throughout 2005 complaining of migraines and tooth pain. (Tr. 574-95.)

Mathis went to Family Medical Center of North Dallas twice in May 2005, immediately following the death of her mother, and again in August 2005, and the medical staff noted that she was "mourning" and suffering from depression and/or anxiety as well as lupus exacerbation, rheumatoid arthritis and migraine headaches. (Tr. 769-79.)

In October and November of that year, Mathis saw Dr. Sherry Gordon ("Gordon") at Urology Associates of North Texas a number of times. (Tr. 682-91.) Gordon diagnosed Mathis with interstitial cystitis and urgency of urination and performed a cystotoscopy. (*Id.*) Gordon described Mathis' affect as anxious and/or depressed at various times, but there is no indication in the record that Gordon was treating Mathis for anxiety or depression. (*Id.*)

In 2006, Mathis visited the HMFW Hospital emergency room several times complaining of ankle pain, lupus flare up, migraine headaches, and injuries resulting from an assault. (Tr. 716-46.) She likewise visited Methodist Hospital's Golden Cross Clinic that year complaining of lupus flare-ups, joint pain, fatigue and swelling from rheumatoid arthritis. (Tr. 749-756.) Additionally, Mathis went back to Family Medical Center in May 2006, where she was treated for injuries resulting from an assault, as well as pain in her body and knee and a headache. (Tr. 759-60.)

In June 2006, about two months before her hearing before the ALJ in this case, Mathis underwent another cystoscopy and hydrodistention with Gordon at the Urology Associates of North

Texas. (Tr. 762-67.) Gordon noted she wasn't surprised that Mathis' lupus had "acted up" given the "tremendous amount of stress" Mathis had been under. (Tr. 765.)

C.    Administrative Hearing

At her hearing before the ALJ, Mathis testified that she was born on July 28, 1974 and had an Associate's Degree in Business Management. (Tr. 799-800.) She testified that she was most recently employed in August of 2006 for a period of about three weeks to a month for between 35 and 36 hours a week. (Tr. 800-01.) She worked at the Tarrant County Sheriff's Department and Commissary visiting inmates' cells to allow them to purchase personal hygiene products and snacks and other items. (Tr. 801.) She also performed some computer work, which she said was difficult for her because of swelling in her hands. (Tr. 808.) Mathis told the ALJ that she was forced to stop working there because of pain in her leg which would not allow her to stand up for more than about 20 to 30 minutes at a time or to sit down for more than about 15 minutes. (Tr. 803.) She also testified that her doctors wanted her to use a wheelchair and that they wanted to perform surgery on her left knee because "the cartilage is completely gone." (Tr. 804.) Mathis testified that she'd had the problem with her leg since about 2003. (Tr. 803.)

Mathis testified that prior to working at the Sheriff's Department, she had worked as a cashier at Wendy's for a short period of time in 2002, and that prior to that she had worked at Eckerd Drug Store in 1999 and 2000, ultimately as an assistant manager. (Tr. 804-05.)

When questioned by her attorney, Mathis testified that she had missed a lot of work because of headaches, lupus flare-ups, and swelling in her knees, legs and feet. (Tr. 806-09.) She also said that the lupus affected her bladder, causing interstitial cystitis and forcing her to need to use the

restroom three to four times an hour. (Tr. 807.) Mathis testified that she suffered from pain in her lower back, hands, knees, feet, and sometimes elbows. (*Id.*) She said she was able to walk about a block, and that she could lift about fifteen pounds when her hands were not swollen, but that she could not lift anything when they were. (Tr. 809.)   Mathis also testified regarding her problems with stress, stating that she feels very stressed when she is rushed, often "shut[ting] down" and "crying uncontrollably." (Tr. 810.)

Mathis testified that she had been treated by Brooks from 2002 to 2004. (Tr. 812.) When asked by the ALJ why she had failed to attend an appointment with the TRC in 2004, she said she did not remember having an appointment with them. (Tr. 812.) Mathis told the ALJ that she had one daughter who was almost eleven years old. (Tr. 812-23.) She said that although her daughter lived with Mathis and Mathis' cousin, that her cousin "mostly [did] everything for [her daughter]." She explained that she had been on Medicaid because of her Lupus, but that her Medicaid was canceled because she had not sent in the appropriate forms. (Tr. 813.) According to Mathis, the forms did not reach her because she had recently moved twice. (Tr. 812-13.) She also testified that she had undergone bladder surgeries which might also affect her ability to work. (Tr. 813-14.)

D.   The ALJ's Decision

In entering his decision, the ALJ performed the five-step sequential evaluation process for determining whether a person is disabled. (Tr. 14-26); 20 C.F.R. § 416.920(b). At step one, the ALJ found that Mathis had not engaged in substantial gainful activity at any time since the date of her SSI application. (Tr. 15, citing 20 C.F.R. § 416.920(b).)

-11-

At step two, the ALJ determined as follows:

> [Mathis] has the following impairments: a history of tension and migraine headaches, fibromyalgia, lupus, rheumatoid arthritis, chronic low back syndrome, interstitial cystitis, recurrent pelvic adhesions, recurrent right ovarian cysts, impairment status-post multiple lysis of adhesion procedures, and impairment status-post bilateral salpingo-oophorectomies. She has a "severe" combination of impairments. (*See* 20 C.F.R. § 416.920(c)).

(*Id.*)

In assessing Mathis' mental impairments, the ALJ applied the standard set forth by the Fifth Circuit in *Stone v. Heckler* and found that Mathis did not have a medically determinable depressive disorder, anxiety disorder, or other severe mental impairment. (Tr. 16, citing *Stone*, 752 F.2d 1099 and Social Security Ruling 85-28.) In a two-page detailed analysis of the medical evidence pertaining to her mental impairments in the record, the ALJ ultimately concluded that Mathis had "no restrictions to her activities of daily living; mild difficulties in maintaining social functioning; no more than mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." (Tr. 17.)

The ALJ continued to step three, finding that Mathis did not have an impairment or combination of impairments that met or equaled a listing at step three of the disability analysis. (Tr. 17, citing 20 C.F.R. Part 404, Subpart P, Appendix 1; §§416.920(d), 416.925-26). The ALJ stated that he had considered the opinions of the State Agency medical consultants who reached the same conclusion when they evaluated Mathis' impairments at the initial and reconsideration levels of the administrative review process. (Tr. 17.) He indicated that he had given those opinions significant

weight because they were "well supported by, and consistent with, the remaining credible medical evidence, particularly the objective medical evidence." (*Id.*)

The ALJ then formulated a RFC for Mathis. (Tr. 18.) He found that she had "retained the residual functioning capacity to lift and carry at least 20 pounds occasionally and 10 pounds frequently, and to sit, stand, or walk (individually or in combination) throughout an 8-hour workday." (*Id.*) He found that her impairments did not otherwise limit her ability to work and that she could thus perform the full range of "light work." (*Id.*) The ALJ determined that Mathis could work full-time with the RFC stated on a sustained basis and that she could maintain employment for an indefinite time period. (*Id.*)

After determining Mathis' RFC, the ALJ set out another seven pages of single-paged text analyzing the evidence he considered before proceeding to step four of the analysis. (Tr. 18-25.) At step four, the ALJ found that Mathis was "capable of performing her past relevant work as an assistant manager at a retail store (Eckerd's) as she performed it and as it is generally performed in the national economy." (Tr. 25.) He noted that such work would not require Mathis to perform work-related activities precluded by her RFC. (*Id.*, citing 20 C.F.R. § 416.965.) Ultimately, the ALJ concluded that Mathis was not disabled within the meaning of the Act at any time from the alleged date of onset through the date of the decision. (*Id.*)

## V. DISCUSSION

A.   Whether the ALJ's determination that Mathis can perform her previous work is supported by substantial evidence.

Mathis first argues that the ALJ's determination that she can perform her past work as an assistant manager is unsupported by substantial evidence. (Pl. Br. at 8-12.) In his decision, the ALJ noted that the Dictionary of Occupational Titles ("DOT") "classifies a retail store manager job as light work as it is generally performed in the national economy." (Tr. 25, citing U.S. Dep't of Labor, *Dictionary of Occupational Titles*, 185.167-046 (4th ed., rev. 1991).) The Department of Labor promulgated the DOT in order to "standardize occupational information in support of job placement activities." U.S. Dep't of Labor, *Dictionary of Occupational Titles* at xv (4th ed., rev. 1991). Thousands of jobs are classified within the DOT based on a number of factors, such as the amount of time required for a typical worker to learn the techniques, information, and facility required for average performance of a specific job. *Dikeman v. Halter*, 245 F.3d 1182, 1186, n. 2 (10th Cir. 2001); *Sutton v. Astrue*, 2010 WL 1685813, at *4 (N.D. Tex. April 2, 2010).

Mathis argues that, according to her testimony at the hearing, the job of assistant manager, as she performed it, "required her to stand or walk over 10 hours a day." (Pl. Br. at 8; Tr. 110.) She also testified that she "handled, grasped, or grabbed big objects an hour and a half per day, and had to write, type, or handle small objects over ten hours a day." *Id.* The Court is not at this time addressing the veracity of those statements by Mathis, but notes that it is well settled that a claimant's inability to perform certain requirements of her past job does not mean that she is unable to perform past relevant work as defined in the regulations. *Leggett v. Chater*, 67 F.3d 558, 564-65

-14-

(5th Cir. 1995) (citing *Jones v. Bowen*, 829 F.2d 524, 527 n. 2 (th Cir. 1987)(per curiam)); *see also* Social Security Ruling 82-61.

Mathis also argues that she has a need for "continuing and frequent treatment for her multiple health problems" that is not compatible with an ability to maintain full time work. (Pl. Br. at 9, citing *Bennette v. Astrue*, 2009 WL 840216, at *4 (W.D. La. March 27, 2009). In response, the Commissioner admits that Mathis went to emergency rooms seeking treatment an "overwhelming" number of times between 2002 and 2006, but argues there is nothing in the medical evidence substantiating a legitimate need for such frequent visits. (Defendant's Brief ("Def. Br.") at 5).

In formulating Mathis' RFC, the ALJ considered the treatment records, including records from her visits to various emergency rooms. (Tr. 18-25.) He analyzed Mathis' testimony regarding the limitations caused by her impairments as follows:

> Although Ms. Mathis has underlying medically determinable impairments that reasonably could be expected to cause some of the symptoms alleged, her testimony and allegations concerning the extent of her pain and functional limitations are only minimally credible. They have been inconsistent and are not reasonably supported by the objective medical evidence and other evidence. The medical evidence does not support disability.

(Tr. 18.) The ALJ then provided examples of the inconsistencies. He noted that Mathis appeared at the hearing wearing a leg brace and using crutches to walk, but that there was no evidence that either were prescribed. (Tr. 19.) He also commented on the fact that the medical records did not support her allegations that her doctors want her to use a wheelchair or that she needed knee surgery. (Tr. 19; 803-804.)

-15-

The ALJ commented on Mathis' frequent visits to the emergency room as follows:

Ms. Mathis has gone to [the] emergency room on many occasions complaining of severe headaches and body pain, but her physical examinations were usually unremarkable, except for occasional tenderness and swelling. She has not exhibited synovitis, joint deformity, inflammation, or other signs indicative of active, severe lupus or rheumatoid arthritis. Her examinations do not indicate she has exhibited the marked swelling she alleged in her testimony...the evidence also does not show she has complained of the anxiety attacks she alleged in her testimony.

(*Id.*) He also noted that her symptoms of interstitial cystitis improved 80% with treatment and that the records did not support her allegations that she needed to use the restroom three to four times an hour. (*Id.*)

Specifically discussing Mathis' allegations of pain caused by migraine headaches, the ALJ noted that although she was diagnosed with migraine and tension headaches during several of her emergency room visits, she was, on each occasion, treated with medication and discharged in stable condition. (Tr. 20.) Moreover, the ALJ noted that the radiographic testing of her head was negative and that her physical exams did not reveal any motor or neurological deficits. (*Id.*) Nor did she "exhibit cognitive or mental limitations associated with her headaches." (*Id.*) And the ALJ commented on a September 2001 emergency room visit where medical personnel noted that she had exhibited narcotic-seeking behavior. (*Id.*)

When Mathis underwent a neurological exam by McIntosh in February 2002, he diagnosed her with "[c]hronic daily headaches, probably transformed migraines." (Tr. 138.) He specifically commented on the fact that she was likely experiencing drug rebound from the amount of vicoprofen she admitted she was taking on a daily basis. (*Id.*) And in his letter to Mathis' physician, McIntosh recommended that her physician stop prescribing narcotics and instead prescribe Amitriptyline and

-16-

naproxen as well as Axert for "breakthrough migraines." (*Id.*)    But Mathis returned to the emergency room dozens of times after that, often requesting narcotic medication. In the month of May alone, she went to the emergency room five times. (Tr. 238-258.) And on two of those five occasions, the emergency room physicians commented on her drug seeking behavior. (Tr. 238-304.)

In fact, the record is replete not only with examples of her treating physicians' comments regarding possible drug-seeking behavior, but also with comments regarding Mathis' failure to follow up as advised or adhere to other medical advice. (*See e.g.,* Tr. 215, 219, 229, 465.) On July 19, 2002, Mathis went to the HMFW emergency room complaining of leg pain and swelling. (Tr. 215.) The emergency room physician noted that Mathis had been given two narcotic prescriptions in the last two weeks, that she had not kept her follow-up appointment with Brooks, her primary care physician, that she had been given two narcotic prescriptions in the last two weeks, and that she was engaging in possible drug-seeking behavior. (Tr. 215). And on August 4, 2004, Mathis presented to the Medical Center of Arlington ER for back pain, and her chart contains a note that the hospital had received notice from the state regulatory board regarding concerns of narcotic abuse by Mathis because she had received numerous Lortab prescriptions in a short period of time. (Tr. 465.)

The ALJ also performed a similar analysis regarding Mathis' claims of knee pain, abdominal pain and neck pain, finding that the medical evidence was either inconsistent with or failed to support her allegations of severity. (Tr. 23-24.)

Mathis argues in her reply brief that the Commissioner's comment on her possible narcotic-seeking behavior amounts to an attempt to make an "end run" around the Administration's Regulations pertaining to situations in which a claimant's drug use is material to a finding of

disability. (Plaintiff's Reply Brief ("Pl. Rep. Br.") at 2, citing 20 C.F.R. §404.1335.)[2] But she is misinterpreting the meaning of this evidence. The comments made by the various emergency room physicians regarding her possible drug-seeking behavior, failure to follow up and follow medical advice all simply support the ALJ's conclusion regarding Mathis' credibility. And the objective medical evidence in the record simply does not establish the need for such frequent emergency room visits. *See, e.g. Harvey v. Barnhart*, 368 F.3d 1013, 1015 (8th Cir. 2004) (finding that the claimant was capable of performing past relevant work, and noting that the claimant's treating physicians found that the claimant's complaints were out of proportion with identifiable medical causes). The Court therefore finds that Mathis has failed to demonstrate that she requires such "continuing and frequent treatment for multiple health problems" that prevent her from maintaining full time work on a sustained basis. (Pl. Br. at 8-9.)

Next, Mathis argues that her own testimony regarding her headaches, swelling in her legs, feet, and hands, and reported difficulty concentrating while taking prescribed medication establishes that she is unable to work on a sustained basis. (Pl. Br. at 9-10.) But there is very little, if any, medical evidence supporting her statements. Various clinical evaluations revealed normal results, including: (1) a normal neck x-ray (Tr. 746); (2) a normal ankle x-ray (Tr. 349); (3) a normal pelvic ultrasound (Tr. 654); (4) two normal chest x-rays (Tr. 377, 481); (5) two normal lumbar spine x-rays (Tr. 377, 511); (6) two normal left knee x-rays (Tr. 433, 710); (7) a normal Doppler ultrasound of her veins (Tr. 723); and (8) seven normal computed tomography studies of her brain (Tr. 251, 340,

---

[2] Section 404.1535 sets forth the process the Commissioner must use when determining whether a drug or alcohol addiction is a contributing factor material to the determination of disability.

522, 539, 671, 732, 739.) Additionally, Pertusi, a rheumatologist, found no clinical evidence of lupus or rheumatoid arthritis when he examined Mathis in July 2004. (Tr. 19, 438, 440, 443.) The ALJ conducted a thorough analysis of Mathis' credibility, and, after comparing her testimony and allegations regarding the extent of her pain and functional limitations with the evidence in the record, found her to be only "minimally credible." The Court finds that there is substantial evidence to support his conclusion.

Finally, Mathis claims that the ALJ failed in his duty to perform a "function-by-function analysis of the exertional and nonexertional job requirements as Mathis was actually able to perform them" and compare those with her RFC before issuing a determination as to whether Mathis could perform her last relevant work. (Pl. Br. at 11, citing Social Security Ruling 96-8p.) To the contrary, the ALJ expressly found that Mathis retained the RFC for the full range of light work, which he broke down into its component parts: the ability to lift and carry at least 20 pounds occasionally and 10 pounds frequently, and to sit, stand, or walk (individually or in combination) throughout an eight-hour workday. (Tr. 20).

RFC is the most an individual can still do despite her limitations. *See* Social Security Ruling 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *Id.* The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* The ALJ is permitted to draw reasonable inferences from the evidence in making his

-19-

decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See* Social Security Ruling 86-8.

The ALJ in this case specifically addressed each of Mathis' impairments and alleged limitations in a multi-paged single-spaced analysis and found as follows:

> After considering all of the evidence, I find Ms. Mathis' impairments in combination allow her to sit, stand and walk, individually or in combination, throughout an 8-hour workday; lift and carry at least 10 pounds frequently and 20 pounds occasionally; and perform the pushing, pulling, postural, and manipulative activities involved in light work. She can perform such activities full-time on a sustained basis and maintain employment, despite her complaints of pain and other symptoms.

He then explained how he came to his conclusion:

> Her subjective complaints have seemed exaggerated in relation to her examination findings, which consistently have been very good. The treatment records consistently indicate she has been able to ambulate independently, without use of an assistive device, and she has not exhibited significant limitations to her strength or range of motion. She also has not exhibited significant swelling, edema, or neurological deficits, certainly not to the degree she has alleged.

(Tr. 18-25.) The ALJ's decision reflects that he performed the necessary function-by-function assessment of Mathis' abilities, and that assessment is supported by substantial evidence. (Tr. 18-25.)

Mathis has failed to meet her burden of proof in the first four steps of the sequential evaluation process. *Crowley*, 197 F.3d at 198; *see also Greenspan*, 38 F.3d at 236. She has failed to show she was unable to perform her past relevant work during the relevant time period on a sustained basis. An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Dollins*

*v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citing *Key v. Callahan*, 109

F.3d 270, 273 (6th Cir. 1997) and *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008)). The

ALJ's determination that Mathis was capable of performing her past relevant work on a

sustained basis is supported by substantial evidence.

> B.   Whether the ALJ's evaluation of Mathis' fibromyalgia is supported by
>      substantial evidence.

At step two, the ALJ found that Mathis' fibromyalgia was a severe impairment. (Tr.

15.) But Mathis claims that the ALJ's ultimate finding regarding a lack of disability is not

supported by substantial evidence because the ALJ improperly weighed the medical opinions

of Brooks. (Pl. Br. at 12-14). Mathis makes the rather convoluted argument that the ALJ

erred because the Commissioner has specifically recognized the importance of treating

sources in evaluating ailments such as chronic fatigue syndrome ("CFS") and fibromyalgia

syndrome ("FMS"). (Pl. Br. 12-13, citing Social Security Ruling 99-2p). The Court finds

Mathis' argument unpersuasive for a number of reasons.

First, there is no evidence in the record that Brooks ever diagnosed or treated Mathis

for fibromyalgia, nor is there any mention of fibromyalgia in his treatment records for her.

(Tr. 379-425.) In fact, Brooks specifically stated that she was disabled due to lupus and

rheumatoid arthritis. (Tr. 396, 409.) The regulation Mathis relies on, Social Security Ruling

99-2p, makes no mention of either of the two conditions Brooks found caused her disability.

It is difficult to imagine how much more consideration the Commissioner should have given

to Brooks' opinions regarding a diagnosis for which he never treated Mathis.

Second, to the extent that Mathis is criticizing the amount of weight the ALJ gave to Brooks' opinion that she was totally disabled, that argument is also unavailing. On June 4, 2003, Brooks opined that Mathis was disabled due to lupus, without further explanation. (Tr. 409.) On January 30, 2004, Brooks wrote a letter stating simply:  "Ms. Heather Mathis is a patient under my care with lupus and rheumatoid arthritis. She is totally disabled as a result of her medical condition." (Tr. 396.)

In formulating Mathis' RFC, the ALJ considered Brooks' opinions, but stated that he would not give them controlling weight because they were "inconsistent with the examination findings and not supported by the medical records, including his treatment records. " (Tr. 19.) While it is true that a treating physician's opinions are "entitled to great weight," an ALJ may decrease reliance on such testimony where there is good cause. *Leggett v. Chater*, 67 F.3d 558 (5th Cir. 1995).  Good cause in this case includes disregarding brief and conclusory statements which "are not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence." *Id.* (citations and internal quotations omitted).  Moreover, as the ALJ properly noted in his analysis of Mathis' RFC, the ultimate determination on whether a claimant is totally disabled "is an issue reserved to the Commissioner." (Tr. 19.)  An ALJ must consider and weigh all medical opinions in the record, even opinions on issues like RFC that are reserved to the Commissioner. *Price v. Astrue*, 572 F.Supp.2d 703, 710 (N.D. Tex. 2008); 20 C.F.R. § 404.1527(e)(2), 416.927(e)(2).  But a treating physician's opinion that a claimant is totally disabled or unable to work has "no special significance." *Frank v. Barnhart*, 326 F.3d 618,

-22-

620 (5th Cir. 2003); *see also* 20 C.F.R. § 404.1527(e)(1). The determination of disability always remains the province of the ALJ. *Id.* And an ALJ may reject the opinion of any physician regarding a claimant's disability status when the evidence supports a contrary conclusion. *See, e.g., Martinez v. Chater,* 64 F.3d 172, 175 (5th Cir. 1995) (citation omitted). The Court finds that the ALJ did not improperly discount the opinion of Mathis' treating physician in evaluating her fibromyalgia.

C.   Whether the ALJ's RFC assessment is supported by substantial evidence.

In her last point on appeal, Mathis asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ's RFC assessment did not include: (1) her severe impairments of depression and anxiety, (2) nonexertional limitations concerning Mathis' swelling, and (3) limitations caused by the side effects of her medications. (Pl. Br. at 15-17.)

First, Mathis claims that the ALJ's RFC assessment is not supported by substantial evidence because he did not include her severe impairments of depression and anxiety. (Pl. Br. at 15-16.) At step two, the ALJ made a specific finding, using the appropriate standard as set forth in *Stone v. Heckler,* that Mathis did not have "a medically determinable depressive order, anxiety disorder, or other mental impairment that is 'severe' as defined in the regulations." (Tr. 16, citing *Stone v. Heckler,* 752 F.2d 1099 (5th Cir. 1985).) The ALJ specifically considered various portions of the record, including Brooks' treatment notes, emergency room treatment records, Gordon's records, Family Medical Clinic of North Dallas' records, and Mathis' own testimony, before coming to his conclusion. (Tr. 16-17.)

-23-

And he specifically noted that the situational anxiety Mathis experienced on several occasions "were reasonable reactions to the assault and other stresses in her life, such as conflict with her ex-husband, and were not necessarily indicative of a mental impairment." (Tr. 17.)  Many of the portions of the record Mathis cites in support of her position are indeed accompanied by extenuating circumstances, such as the death of Mathis' mother, an assault by her ex-husband, and a violent relationship with a girlfriend.  (Tr. 716-725, 727, 736-40, 742, 745, 772.)

Next, Mathis argues that the ALJ improperly omitted limitations regarding her swelling in the RFC he formulated.  But the ALJ's decision reflects that he recognized and compensated for Mathis' physical impairments in the RFC assessment by limiting her to light work (Tr. 18.), and he specifically considered her allegations pertaining to swelling and found that her subjective complaints "have seemed exaggerated in relation to her examination findings, which consistently have been very good." (Tr. 24.)  Mathis has not demonstrated that the Commissioner's assessment of her RFC is unsupported by substantial evidence for failure to include a limitation regarding swelling.

Finally, Mathis claims that the RFC is not supported by substantial evidence because the ALJ failed to include any limitations caused by the side effects of her medications.  (Pl. Br. at 17.)  In Mathis' application for benefits, Mathis stated that her medications caused drowsiness and nausea.  (Tr. 101.)  But there is no evidence in the entire record that she complained to any of her physicians of any side effects of her medications.  Nor is there any evidence that she requested any modification of her medications due to negative side effects.

-24-

And Mathis has failed to cite to any evidence that the side effects of her medications would limit her ability to perform her past relevant work as an assistant manager. The ALJ considered Mathis' subjective complaints, and based on the entire record, concluded that Mathis retained the RFC for a full range of light work. (Tr. 18-25.) Mathis has not shown that the ALJ's determination that she can perform a full range of light work is unsupported by substantial evidence.

RECOMMENDATION

For the foregoing reasons, the Court recommends that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until June 18, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal

conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 18, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED MAY 28, 2010.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE